IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TINA CICIRELLO                    )
                                  )
v.                                )     No. 3:10-1084
                                  )     Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION    )


To:     The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided

under the Social Security Act.  The case is currently pending on plaintiff's motion for

judgment on the administrative record (Docket Entry No. 14), to which defendant has

responded (Docket Entry No. 19).  Plaintiff has further filed a reply brief in support of her

motion.  (Docket Entry No. 20)  Upon consideration of these papers and the transcript of the

administrative record (Docket Entry No. 10),[1] and for the reasons given below, the

undersigned recommends that plaintiff's motion for judgment be DENIED and that the

decision of the SSA be AFFIRMED.

_____

        [1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her DIB and SSI applications on April 16, 2007, alleging disability as of August 23, 2005. (Tr. 144-58, 177) These applications were denied at the initial and reconsideration stages of agency review. (Tr. 84-87, 91-94) Plaintiff thereafter filed a request for hearing before an Administrative Law Judge ("ALJ"). The ALJ heard plaintiff's case on July 21, 2009. (Tr. 23-73) Plaintiff appeared before the ALJ with her attorney and gave testimony, as did a witness on plaintiff's behalf and an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement. On September 25, 2009, the ALJ issued her written decision denying plaintiff's claim to benefits. (Tr. 8-22) The ALJ's decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act only through June 30, 2007.

2.  The claimant has not engaged in substantial gainful activity since August 23, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: major depressive disorder, cognitive disorder with a history of a traumatic brain injury and personality disorder, migraine headaches, slight scoliosis of the lumbar spine, fibromyalgia and hypothyroidism (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, she may have no more than minimal contact with the public, cannot perform work involving detailed or complex job instructions and cannot perform production paced work.

Case 3:10-cv-01084   Document 21   Filed 11/26/12   Page 2 of 24 PageID #: 1454

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 20, 1975 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 23, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-11, 13, 19-21)


        On September 17, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration.  This civil action was thereafter timely filed, and the court has jurisdiction.  42 U.S.C. §§ 405(g), 1383(c)(3).  If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive.  Id.

3

## II. Review of the Record

The following review is taken from the government's brief, Docket Entry No. 19 at 2-13.

### A. Medical Evidence

In 1998, plaintiff was involved in a motor vehicle accident and sustained a closed head injury (Tr. 277, 295).

On May 3, 1999, a vocational counselor certified that plaintiff did have a physical or mental disability which constituted or resulted in a substantial impediment to employment and that she required appropriate training in speech and hearing, vocational evaluation, job readiness training, and job development and placement services (Tr. 372).

An electroencephalograph (EEG) and an MRI of the brain taken on December 11, 2003, were normal (Tr. 401-402). EEGs taken on June 15, 2004 and August 17, 2004, were also normal (Tr. 293-294).

On December 1, 2004, Mark Phillips, Ph.D., a licensed clinical psychologist, examined plaintiff (Tr. 277-281). He administered several tests to measure her abilities in attention and concentration, memory, learning, language, visual motor skills, reasoning and abstraction, and emotional functioning. Id. Her scores for memory were in the normal range except one, which indicated a mild impairment in working memory. Id. Dr. Phillips' impression was that plaintiff had deficits in complex and sustained attention, non-verbal fluency, visual-motor tracking speed, and cognitive flexibility and abstraction. Id. He noted symptoms of depression, social anxiety, and worry. Id. He stated that plaintiff's test results were consistent

with frontal lobe injury resulting in executive function[2] deficits. Id. He considered the deficits significantly contributory to plaintiff's reported problems in organization, planning, and attention allocation. Id.

On December 3, 2004, plaintiff visited the emergency room after a relatively mild motor vehicle accident (Tr. 350-351). X-rays showed no fractures or acute injuries to the cervical, thoracic, or lumbar spines. Id. The doctor ordered a CT scan of the head at plaintiff's request (Tr. 351). It showed no acute intracranial injury (Tr. 349).

An upper GI series taken on December 9, 2004, for epigastric pain was normal (Tr. 392). A MRI of the cervical and lumbar spines taken on January 6, 2005, was normal (Tr. 385-387).

Psychiatry outpatient progress notes from January 27, 2005 through April 7, 2005, showed plaintiff received counseling for personal ineffectiveness, anxiety, relationship issues, and depressive symptoms (Tr. 324-343). Her global assessment of functioning (GAF)[3] was consistently 65, which indicated some mild symptoms or some difficulty in social occupational, or school functioning, but that plaintiff was generally functioning pretty well, with some meaningful interpersonal relationships[4] (Tr. 325, 330, 335, 340).

Andrew John Phay, Ph.D., A.B.P.N., a neuropsychologist, evaluated plaintiff on April 25, 2005 and May 3, 2005 (Tr. 935-942). Dr. Phay found plaintiff's intellectual functioning

---

[2]Executive functioning involves the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. Diagnostic and Statistical Manual - Text Revision, 4th edition (DSM-IV-TR,2000).

[3]The GAF rating reflects the individual's overall level of functioning. DSM-IV-TR,2000.

[4]DSM-IV-TR,2000.

5

in the average range and her verbal abilities markedly superior to her non-verbal abilities (Tr. 940). Her oral comprehension, production, word finding, articulation, and fluency in conversation were intact, and her vocabulary knowledge and fund of information were consistent with her current general level of verbal functioning. Id. Her visual-spatial abilities were in the low average range, and Dr. Phay noted that her current results reflected a marked improvement from her 1998 performance (Tr. 940-941). Plaintiff's concentration was mildly/moderately impaired (Tr. 941). Her short term and delayed verbal memory were intact. Id. Dr. Phay noted that her current results were similar to her December 2004 evaluation but considerably above her test results from 1998. Id. Plaintiff's motor speed, visual search speed, verbal fluency for generation of words, flexibility of concentration, and verbal reasoning were intact. Id. Plaintiff's cognitive processing speed varied considerably on simple tasks and impaired as the task became more complex. Id. Her ability to inhibit automatic response was moderately impaired. Id. Her non-verbal reasoning was intact on two tasks and borderline impaired on two other tasks. Id. Dr. Phay opined that vocational rehabilitation services and support appeared appropriate and that plaintiff was "clearly functioning at Rancho Level 8,"[5] which indicates a purposeful, appropriate response, i.e., the patient is alert and oriented; recalls and integrates past events; learns new activities and can continue with supervision; is independent in home and living skills; is capable of driving; demonstrates defects in stress tolerance, judgment, and abstract reasoning; and possibly functions at reduced levels in society[6]

---

[5]The Rancho Los Amigos Guide to Cognitive Levels is a scale widely used to classify a neurological patient's level of cognitive dysfunction according to behavior. The scale provides eight levels. Taber's Cyclopedic Medical Dictionary, 21st edition (2009) (Taber's).

[6]Taber's.

6

(Tr. 942).

Psychiatry outpatient progress notes from May 4, 2005 through July 7, 2005, showed plaintiff received counseling for interpersonal relationship problems, depressive symptoms, and anxiety symptoms (Tr. 302-323). Her GAF was consistently 65, which indicates that she was generally functioning pretty well, with some meaningful interpersonal relationships[7] (Tr. 303, 306, 309, 312, 315, 322).

On July 21, 2005, Renee Glenn, M.D. performed a psychiatric evaluation of plaintiff (Tr. 295-296). Dr. Glenn opined that plaintiff would be an appropriate candidate for the Tennessee Rehabilitation Center's Traumatic Brain Injury Program (Tr. 296).

On August 15, 2005, plaintiff saw Jeffrey T. Harris, M.D. (Tr. 962). She complained of moderate to severe headaches occurring three to four times per week. Id. Upon examination, her cognition was normal, her cranial nerves were intact, her motor strength was 5/5 and symmetric, her sensory modalities were intact, her deep tendon reflexes were 2/4 and symmetric, her cerebellar exam was normal, and her gait and coordination were normal. Id.

On August 25, 2005, a therapist with the Traumatic Brain Injury Program evaluated plaintiff (Tr. 373-376). The therapist evaluated her abilities in the following areas as independent: feeding, bathing, dressing, hygiene/grooming, bladder and bowel care, and mobility (Tr. 376).

On December 21, 2005, plaintiff saw Dr. Harris (Tr. 960-961). She reported being headache free for the last six weeks while on pregabalin that Dr. Harris started her on at her last visit. Id. Her neurological exam was normal. Id.

---

[7]DSM-IV-TR,2000.

7

Records from Centerstone Community Mental Health Centers (Centerstone) dated February 9, 2006, indicate that plaintiff had moderate limitations in activities of daily living; mild limitations in interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change (Tr. 535-537). Her GAF was 55, indicating moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)[8] (Tr. 537).

On March 1, 2006, Dr. Harris saw plaintiff for a follow up appointment (Tr. 510). Plaintiff reported that her headaches were occurring approximately twice per week. Id. After starting Lyrica, she went as long as approximately one month without any headaches, but an exacerbation of irritable bowel syndrome triggered her headaches again. Id. Neurological examination was normal except for memory impairment, which had been stable since the time of her traumatic brain injury (TBI). Id.

On March 2, 2006, plaintiff underwent a psychiatric evaluation at Centerstone (Tr. 541-545). On mental status examination, her mood was anxious and depressed, her affect and behavior were appropriate, her speech was organized, and she was oriented in all four spheres (Tr. 543). Her thought process was coherent; her thought content showed preoccupation; and her insight, judgment, and motivation for treatment were fair. Id. Her memory and concentration were within normal limits, and her risk of injury to herself or others was low (Tr. 543-544).

Psychiatry outpatient progress notes from May 25, 2006, show plaintiff received

---

[8]Id.

8

counseling for interpersonal relationship problems, depressive symptoms, and anxiety symptoms (Tr. 297-301). Her GAF was 65, which indicates that she was generally functioning pretty well, with some meaningful interpersonal relationships[9] (Tr. 298).

In May 2006, plaintiff reported to Dr. Harris that she had graduated from the Traumatic Brain Vocational Rehabilitation Training Institute (Tr. 509). She reported only getting severe headaches during her menstrual cycle and getting approximately two milder headaches per week. Id. She was tolerating Lyrica without difficulty. Her neurological exam was unchanged. Id.

Records from Centerstone dated June 14, 2006, indicate that plaintiff had mild limitations in activities of daily living and interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change (Tr. 532-534). Her GAF was 60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning[10] (Tr. 534).

On August 16, 2006, plaintiff reported to Dr. Harris that her headaches had increased in the last three weeks and had been occurring daily for the last week (Tr. 508). She also complained of acid reflux and insomnia. Id. Her neurological exam was normal except for cognitive impairment from her TBI. Id.

On September 29, 2006, Dr. Harris wrote a letter to an attorney stating that plaintiff's epilepsy was cured but her remaining symptoms with memory, multi-tasking, and concentrating, as well as migraines and depression made her unable to pursue her case (Tr.

---

[9]Id.

[10]Id.

1081).

Records from Centerstone dated October 11, 2006, indicate that plaintiff had mild limitations in activities of daily living and interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change at 529-531). Her GAF was still 60 (Tr. 531).

On December 12, 2006, Dr. Harris stated that plaintiff's depression had finally started to stabilize (Tr. 507). Her neurological exam showed her cognition at baseline. Id. Her cranial nerves and sensory modalities were intact, her motor strength was 5/5 and symmetric, and her deep tendon reflexes 2/4 and symmetric. Id. Her cerebellar, gait, and coordination exams were within normal limits. Id.

Records from Centerstone dated January 26, 2007, indicate that plaintiff had mild limitations in activities of daily living and interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change (Tr. 526-528). Her GAF remained 60 (Tr. 528).

On March 26, 2007, Dr. Harris performed a follow-up evaluation (Tr. 506). Plaintiff reported having three to four headaches a month that may last for approximately one day. Id. Dr. Harris stated that plaintiff's depression appeared to be stable and that her neurological exam remained normal. Id. His impression was that plaintiff was tolerating her headaches without much difficulty and should remain on her current migraine medication regimen. Id.

Records from Centerstone dated April 20, 2007, indicate that plaintiff had mild limitations in activities of daily living and interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change

10

(Tr. 522-525).  Her GAF remained 60 (Tr. 525).

On June 28, 2007, plaintiff saw Dr. Harris (Tr. 959).  On examination, her cognition was normal, her cranial nerves were intact, her motor strength was 5/5 and symmetric, her sensory modalities were intact, her deep tendon reflexes were 2/4 and symmetric, her cerebellar exam was normal, her gait was normal, and her coordination was normal.  Id.

On June 29, 2007, Reeta Misra, M.D. reviewed plaintiff's medical records and completed a physical residual functional capacity (RFC) assessment of plaintiff (Tr. 859-866).  Dr. Misra opined that plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently, stand and/or walk about six hours in an eight-hour day, sit about six hours in an eight-hour day, and push and/or pull without limitation other than her lifting/carrying restriction (Tr. 860).  Dr. Misra further opined that plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl (Tr. 861).  Dr. Misra found no manipulative, visual, communicative, or environmental restrictions (Tr. 862-863).

An MRI of the lumbar spine taken on July 11, 2007, showed early/mild lumbar spondylosis, mild to moderate dextroscoliosis centered in the lower thoracic spine, and slight biforaminal narrowing at L4-5 and L5-S1 (Tr. 907).

On July 26, 2007, P. Jeffrey Wright, Ph.D. reviewed plaintiff's medical records and completed a psychiatric review technique form and a mental RFC assessment for plaintiff (Tr. 867-884).  Dr. Wright opined that plaintiff's dysthymic disorder caused a mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace (Tr. 870-877).  He opined that plaintiff had not had any episodes of decompensation of extended duration and that the

11

evidence did not establish the presence of the paragraph C criteria for listings 12.02 or 12.04 (Tr. 877-878). Dr. Wright opined that plaintiff had only moderate limitations in the following abilities: understanding and remembering detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting (Tr. 881-882). He opined that all her other abilities were not significantly limited. Id.

On August 7, 2007, plaintiff saw Dr. Harris (Tr. 958). Her neurological exam showed multiple trigger points consistent with fibromyalgia. Id.

On August 10, 2007, plaintiff saw Caprice Fussell, CNP, MSN at Nashville Bone & Joint for a follow up for back pain (Tr. 959). Her physical examination showed no signs of myelopathy, a nonantalgic gait, symmetrical reflexes, and negative straight leg raise. Id.

On September 17, 2007, April Collier, MSN, FNP of Hope Family Medicine provided a functional assessment of plaintiff (Tr. 920-921). Nurse Collier opined that, in an average eight-hour workday, plaintiff could sit 100 percent of the time, stand 60 percent of the time, walk 80 percent of the time, lift and carry 50 percent of the time, and handle objects 100 percent of the time (Tr. 920). Nurse Collier opined that plaintiff's mental capacity for understanding and memory was excellent, for sustained concentration and persistence was good, for social interaction was good, and for adaptation was good (Tr. 921).

On October 16, 2007, Albert J. Gomez, M.D. examined plaintiff (Tr. 923-926). He found moderate tenderness of the cervical spine, flexion to 40 degrees, normal extension, and right and left rotation to 70 degrees. Id. He found mild tenderness of the lumbar spine, normal

12

flexion, extension to 10 degrees, and right and left lateral flexion to 20 degrees.  Id.  Range of motion was full in both shoulders, elbows, wrists, hips, knees, and ankles.  Id.  Hand grip, fine finger movements, finger extension, and pinch grip were normal.  Id.  Motor strength was 4/5 in the upper and lower extremities, deep tendon reflexes were 2+ bilaterally in the upper and lower extremities, straight leg raising was positive bilaterally at 45 degrees, and straight leg raising in the sitting position was negative bilaterally.  Id.  Plaintiff could tandem walk, heel walk, toe walk, and squat and stand on one leg normally.  Id.  She had moderate tenderness to palpation of her arm and leg muscles but no severely painful trigger points.  Id.  Based on his examination, Dr. Gomez opined that plaintiff could occasionally lift 20 pounds and stand and sit at least six hours in an eight-hour workday with normal breaks.  Id.

On October 31, 2007, plaintiff saw Nurse Fussell at Nashville Bone & Joint again (Tr. 947-948).  On examination, plaintiff again showed no signs of myelopathy, her reflexes were symmetrical, and her strength and sensation in the lower extremities were equal and intact.  Id.

On December 17, 2007, Dr. Harris saw plaintiff again (Tr. 956-957).  Plaintiff's neurological exam was normal.  Id.  Dr. Harris restarted plaintiff's Prozac for depression and deferred to her psychiatrist for further adjustments.  Id.  He also started her on Zonegran and Darvocet for her headaches.  Id.

In January 2008, plaintiff saw William P. Dutton, M.D., a urologist, for evaluation of low back pain after a CT scan confirmed the existence of a small kidney stone and two or three almost non existent densities (Tr. 976-978).  Dr. Dutton noted that plaintiff had some scoliosis of the spine, which probably caused her back discomfort.  Id.

On February 21, 2008, Glenda D. Knox-Carter, M.D. reviewed plaintiff's medical records and completed a physical RFC assessment (Tr. 927-934).  Dr. Knox-Carter opined that

13

plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, and push and/or pull without limitation other than that for lifting and carrying (Tr. 928). Dr. Knox-Carter further opined that plaintiff could frequently climb ramps, stairs, ladders, ropes, scaffolds; balance; stoop; kneel; crouch; and crawl and had no manipulative, visual, communicative, or environmental limitations (Tr. 929-932).

### B. Non-Medical Evidence

At the administrative hearing, plaintiff's attorney stated that in May 2008, plaintiff had married an internal medicine physician who monitored her and prescribed her medications (Tr. 27). Plaintiff testified that she earned a bachelor of science degree in speech and theater in 2004 (Tr. 29, 50). She testified that she had some special accommodations from the university, such as a note taker, extra time to take her tests, and some leniency in doing projects (Tr. 50). She also testified that she had pain in her back and neck at about a level of four on a scale of one to ten (Tr. 39). She said she took nonsteroidal anti-inflammatory drugs for the pain but they bothered her stomach, so she tried to do exercises suggested by rehabilitation people (Tr. 40). She also used heat and cold. Id. She said she had daily headaches, for which she took several medications. Id. At the time of the hearing she was only taking Tylenol and a muscle relaxer from time to time and had not been to see the neurologist in a little while. Id. She said she could walk less than a mile on a bad day but more on a good day, although any walking exacerbated her pain. Id. She said that a few times a month she had a headache and body aches that prevented her from getting out of bed (Tr. 41). She was taking Wellbutrin for depression, and it made her functional (Tr. 42). She stated that her migraines were out of control in 2006 but that, at the time of the hearing, they were a little more under control,

14

although she was fatigued and had body aches.  Id.  She considered her depression to be a four or five on a scale of one to ten (Tr. 47)).

Also at the administrative hearing the vocational expert (VE) testified that a hypothetical person with plaintiff's work history, who could lift and carry no more than 20 pounds occasionally and ten pounds frequently, who was restricted from detailed or complex job instructions and production paced work, and who could not have more than minimal contact with the public could perform the jobs of data entry clerk, laundry worker, construction signaler, and garment bagger (Tr. 60-62, 69-70).

On July 29, 2009, Lisa Howser, MA, a licensed psychological examiner with Brain Injury Association of Tennessee, wrote a letter to the ALJ in which she stated that plaintiff's frontal lobe injury resulted in impairment to the "executive functioning" process that impacted her overall brain functions (Tr. 1078-1079).

The same day, Pam Bryan, the Interim Executive Director of Brain Injury Association of Tennessee, wrote to the ALJ that plaintiff's deficits from her brain injury caused problems in her employment as a share mentor coordinator (Tr. 1080).  She specified that plaintiff had severe migraine headaches, organizational problems, severe fatigue, extreme mood swings, and difficulties with decision making, problem solving and maintaining attention and focus.  Id.

III.  Conclusions of Law

A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the

15

correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed

16

impairment in Appendix 1 to Subpart P of the Regulations. Claimants with
lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be
found to be disabled.

5) If a claimant cannot perform his past work, other factors including age,
education, past work experience and residual functional capacity must be
considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r

of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

      The SSA's burden at the fifth step of the evaluation process can be carried by

relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule. See

Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be

used to direct a conclusion, but only as a guide to the disability determination. Id.; see also

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima

facie case by coming forward with proof of the claimant's individual vocational qualifications

to perform specific jobs, which is typically obtained through vocational expert ("VE")

testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

      In determining residual functional capacity ("RFC") for purposes of the

analysis required at steps four and five above, the SSA is required to consider the combined

effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff alleges that she meets the criteria of Listings 11.18 (Cerebral Trauma), 12.02 (Organic Mental Disorders), and 12.04 (Affective Disorders) due to these conditions having resulted in "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate."[11] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(C)(2), 12.04(C)(2). The ALJ found "no evidence" to support the existence of such a residual disease process or resulting mental fragility. (Tr. 13) In support of her argument, plaintiff cites notations from the record of her mental health treatment that demonstrate her instability and difficulty adjusting to stressful changes: "she had 15-20 different jobs in five years; had a work-related event in which she 'lost it'; tried to go back to work for a few hours and felt overwhelmed; went to stay with her parents for 2-3 weeks due to suicidal thoughts; stays in bed to avoid others; has to have her father pay her bills; has difficulty with authority at times; has borderline/instability tendencies; had a stressful relationship with her

_____

[11]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." 20 C.F.R. Pt.404, Subpt. P, App. 1, § 12.00(C)(4).

new boss and missed work days; had problems focusing at work; has extreme difficulty handling changes; has difficulty making decisions, has difficulty managing stress, has difficulty in relationships; and has a caretaker help her with activities of daily living[.]" (Docket Entry No. 14-1 at 10) (internal citations omitted)

The government counters with the following notations from the record supporting plaintiff's ability to adapt (albeit with difficulty at times) to changes in her environment without decompensating, including: "spending time with other people in person, on the telephone, and on the computer; volunteering; taking a trip to visit her sister; flying alone from San Diego to Sacramento and making a friend on the plane; going to college and earning a bachelor's degree in speech and theater; taking computer classes after earning her degree; dating several different men; interviewing for jobs; interacting with other patients in therapy sessions; advocating at the capitol for victims of TBI; meeting an internal medicine doctor online and marrying him; and going on her honeymoon." (Docket Entry No. 19 at 18) (internal citations omitted)

The undersigned is persuaded by the government's argument on this issue, particularly in light of the standard of review. It is clear that the foregoing substantial evidence cited by the government supports the ALJ's finding of no listing-level impairment. "It is the role of the ALJ to resolve conflicts within the evidence." Baldwin v. Astrue, 2009 WL 4571850, at *4 (E.D. Ky. Dec. 1, 2009) (citing Buxton v. Halter, 246 F.3d 762, 775 (6th Cir. 2001)). "This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." Reynolds v. Comm'r of Soc. Sec., 424 F. App'x

411, 414 (6th Cir. 2011). Accordingly, the ALJ's finding of no listing-level impairment must stand.

Plaintiff next contends that the ALJ erred in her weighing of the opinion evidence. In particular, plaintiff argues that the ALJ should have given controlling or significant weight to the May 1999 opinion of a vocational rehabilitation counselor that she was disabled and in need of vocational rehabilitation (Tr. 372); the opinion of psychologist Dr. Mark Phillips, Ph.D, and Lisa Howser, M.A., that plaintiff had significant executive functioning deficits (Tr. 277-81, 1079); the opinion of Pam Bryan, the Interim Executive Director of the Brain Injury Association of Tennessee, that plaintiff's brain injury-related deficits left her unable to continue in her job as Mentor Coordinator with that association (Tr. 1080); the opinion of Dr. Harris, plaintiff's treating neurologist, that plaintiff could not "handle pursuing this case [for benefits] due to her remaining deficits" (Tr. 1081); and the opinion of a treating psychiatrist, who reportedly recommended that plaintiff quit her job (Tr. 1035).

The short answer to these contentions, in order, is that an opinion on the ultimate issue of disability from a vocational rehabilitation counselor some six years prior to the date when plaintiff alleges she became disabled is deserving of no particular weight; the ALJ clearly factored plaintiff's significant executive functioning deficits into her finding of plaintiff's residual functional capacity, to the extent that she "cannot perform work involving detailed or complex job instructions and cannot perform production paced work" (Tr. 13); the opinion of Ms. Bryan is not a medical opinion, but is a lay opinion that only speaks to plaintiff's ability to perform one particular job in the economy, and is therefore not

deserving of any particular weight; the rather vague opinion of Dr. Harris in September 2006 that plaintiff could not handle pursuing her disability claim due to her symptoms is not an opinion that reflects on the severity of plaintiff's work-related limitations, and was in fact belied by plaintiff's continued pursuit of her disability claim, and is therefore not entitled to any special weight; and, the recommendation that plaintiff quit her job, attributed to an unnamed treating psychiatrist by plaintiff in her subjective report of symptoms to neurologist Heather Adkins, M.D. (Tr. 1035), does not appear to have been documented in the record by the psychiatrist him/herself, and is therefore nothing more than hearsay. Accordingly, the undersigned cannot find that the ALJ improperly weighed these opinions.

Likewise, though plaintiff argues that the ALJ erred in failing to correctly interpret the opinion evidence which he did credit, specifically Dr. Phay's opinion and the assessments of plaintiff's mental health treatment providers at Centerstone, the undersigned finds no merit in this argument. Plaintiff's argument is simply that these opinions support the existence of the same listing-level impairments already discussed in this report. For the reasons previously given, the undersigned finds substantial evidentiary support for the ALJ's determination that plaintiff's impairments, though severe (as reflected in, *e.g.*, the reports of Dr. Phay and the Centerstone providers), do not meet or equal the criteria of any listed impairment.

Finally, with respect to the ALJ's consideration of the opinion evidence, plaintiff argues that Dr. Dutton's opinion that plaintiff's scoliosis explained her back pain should have been given more weight than that of Dr. Gomez, inasmuch as Dr. Dutton is a treating physician and Dr. Gomez is a consultative examiner. However, as the government

21

points out in its brief, Dr. Dutton himself saw plaintiff in consultation, and had only seen her

once at the time he offered the opinion that "a bit of a SS scoliosis on KUB . . . probably

explains her back discomfort." (Tr. 978) Dr. Dutton, a urologist who went on to perform an

outpatient lithotripsy procedure on plaintiff's kidney stones, saw plaintiff on one more

follow-up visit after this procedure, and his entire association with plaintiff's case lasted less

than one month. (Tr. 963-68)[12] He is therefore no more deserving of treating source status

than is Dr. Gomez, nor is his opinion with regard to the source of plaintiff's back pain

deserving of significant weight. See 20 C.F.R. § 404.1527(d)(2).[13] In any event, the ALJ

acknowledged that plaintiff's scoliosis caused her pain and limited her exertional abilities.

(Tr. 19) Her finding that the extent of such exertional limitation was as described by Dr.

Gomez is not inconsistent with the record as a whole.

      Next, plaintiff argues that the ALJ erred in rejecting her subjective complaints

of disabling symptoms, in that she failed to mention the instances where plaintiff's consistent

complaints to her doctors resulted in significant, documented limitations, but "merely

---

[12]Although plaintiff makes reference in her reply brief to "the long-term treating physician, Dr. Dutton" (Docket Entry No. 20 at 3), the undersigned finds no support in the record for the existence of such a longitudinal relationship with Dr. Dutton.

[13]"[Treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)[.] . . . When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source. . . . For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would if it were from a nontreating source.").

decided that the claimant was not credible and disregarded all her years of documented symptoms, pain, and suffering." (Docket Entry No. 14-1 at 22) This assertion, however, is manifestly untrue, as the ALJ explicitly found that the credible effects of plaintiff's documented conditions and symptoms limited her to less than the full range of light work, as follows:

> The claimant's traumatic brain injury affected her memory and ability to focus. Therefore, the claimant is restricted from jobs with detailed or complex instructions. Her depression impedes her social functioning skills so she is limited to minimal contact with the public. Her scoliosis and fibromyalgia cause the claimant pain and limit her exertional abilities. Therefore, the claimant is limited to a light range of work and cannot perform production based work. There is no reason to suppose the claimant's migraines and hypothyroidism result in any limitations other than those set out above.

(Tr. 19) The ALJ gave reasons for finding plaintiff's subjective complaints only partially credible, including the fact that she met her husband online even though she testified she could only sit at the computer for a few minutes at a time; she admitted being less than fully forthcoming with her current psychiatrist; she seemed more concerned that working full-time would hamper her performance of household chores she needed to keep up, rather than with her ability to do the work itself; and the record reveals that her medications have been relatively effective in controlling her symptoms. (Tr. 19) An ALJ's credibility determination is due considerable deference on judicial review, see, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), and the undersigned finds substantial evidence supporting that determination in this case.

Plaintiff's remaining arguments -- that the ALJ erroneously evaluated her mental impairments and erred in relying upon the vocational expert's testimony -- rely upon

her prior assertion of disabling, listing-level mental impairments and her argument that her treating sources' opinions support the assertion of disability.  Consistent with the foregoing determination of those arguments, and based on substantial evidence on the record as a whole, the undersigned finds no error in the decision of the ALJ, and concludes that this Court should affirm that decision.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 26th day of November, 2012.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE